# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TINA OLIVER LINK,      )
                               )
           Plaintiff,     )
                               )
     v.                    )       1:19CV662
                               )
ANDREW M. SAUL,        )
Commissioner of Social    )
Security,[1]            )
                               )
           Defendant.     )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Tina Oliver Link, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 6 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 9, 11, 12;

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul substitutes for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

<u>see also</u> Docket Entry 13 (Defendant's Memorandum)).[2]   For the
reasons that follow, the Court should enter judgment for Defendant.

## I.   PROCEDURAL HISTORY

Plaintiff applied for DIB, alleging a disability onset date of
August 8, 2014.   (Tr. 33, 206-10, 236.)   Upon denial of that
application initially (Tr. 73-103, 122-30) and on reconsideration
(Tr. 104-20, 132-39), Plaintiff requested a hearing de novo before
an Administrative Law Judge ("ALJ") (Tr. 140-41).   Plaintiff, her
attorney, and a vocational expert ("VE") attended the hearing.
(Tr. 27-72.)   The ALJ subsequently ruled that Plaintiff did not
qualify as disabled under the Act.   (Tr. 7-19.)   The Appeals
Council thereafter denied Plaintiff's request for review (Tr. 1-6,
201-05), thereby making the ALJ's ruling the Commissioner's final
decision for purposes of judicial review.

In rendering that decision, the ALJ made the following
findings:

> 1.   [Plaintiff] meets the insured status requirements of
> the . . . Act through December 31, 2021.
>
> 2.   [Plaintiff] has not engaged in substantial gainful
> activity since August 8, 2014, the alleged onset date.

---

[2] Plaintiff originally filed a separate Motion for Summary Judgment (Docket Entry 9) and a Memorandum of Law in Support (Docket Entry 10) and then re-filed a combined Motion for Summary Judgment (<u>see</u> Docket Entry 11 at 2-3) and Memorandum of Law in Support (<u>see</u> Docket Entry 11 at 1, 4-27).

3.   [Plaintiff] has the following severe impairments: degenerative disc disease, status post total left knee arthroplasty, carpal tunnel syndrome of the right hand, connective tissue disease with features of Lupus, headaches post herpetic neuralgia, and left eye light sensitivity with pain.

.  .  .

4.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

.  .  .

5.   .  .  .  [Plaintiff] has the residual functional capacity to perform light work . . . except she can occasionally push and pull with the upper and lower extremities; and she can occasionally handle and finger with the right upper extremity, but no tasks should involve small objects or that require visual precision – defined as tasks that require use of fine motor skills to finger objects that are smaller than one inch that need to be placed in exact locations, such as electronic circuit boards or other small electronic items that require exact placement of parts.  She can occasionally climb ramps and stairs, but should never climb ladders, ropes or scaffolds.  She can frequently balance, stoop, kneel, crouch and occasionally crawl.  She can have no exposure to unprotected heights, moving mechanical parts, or hazardous work settings; and should avoid concentrated exposure to bright lights, flashing lights, or outdoor sunlight but should be allowed to wear sunglasses for frequent exposure to work task [sic] indoors or under indoor lighting.  [Plaintiff] would be off task 10% of the workday in addition to normal breaks due to pain and side effects from medication.

.  .  .

6.   [Plaintiff] is capable of performing past relevant work as a Management Trainee and Health Club Membership Salesperson.  This work does not require the performance of work-related activities precluded by [Plaintiff]'s residual functional capacity.

. . .

    7. [Plaintiff] has not been under a disability, as defined in the . . . Act, from August 8, 2014, through the date of this decision.

(Tr. 12-18 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

4

Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving

5

a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." <u>Id.</u> "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." <u>Id.</u> (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent

---

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

6

that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[5] Step four

_____

[4] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B.  Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ failed to identify herpes zoster eye pain as a symptom and as a severe impairment which ultimately developed into post-herpetic and trigeminal neuralgia" (Docket Entry 11 at 17);

---

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

2) "[t]he ALJ set forth an RFC finding that was vague and failed to account for Plaintiff's severe impairments" (id. at 18);

3) "[t]he ALJ failed to present a logical connection between the evidence of record and his conclusions as to Plaintiff's RFC" (id. at 20); and

4) "[t]he ALJ has failed to state the weight he has given to Plaintiff's various treating providers whose findings and opinions appear in the record" (id. at 21).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 13 at 10-25.)

## 1. Herpes Zoster Eye Pain

In Plaintiff's first assignment of error, she maintains that "[t]he ALJ failed to identify herpes zoster eye pain as a symptom and as a severe impairment which ultimately developed into post-herpetic and trigeminal neuralgia." (Docket Entry 11 at 17.) According to Plaintiff, "[t]he zoster virus was the trigger for Plaintiff's post-herpetic neuralgia; the neuralgia affected the trigeminal nerve and became the etiology for Plaintiff's [] symptoms" of "severe pain, severe light sensitivity, nausea, vomiting, headaches and [] decreased corrected vision." (Id.) Plaintiff additionally faults the ALJ for "fail[ing] to discuss any of the procedures [Plaintiff underwent] in an attempt to diminish or relieve her symptoms; he merely stated that 'the intensity, persistence and limiting effects of [Plaintiff's] symptoms [we]re

9

not entirely consistent with the medical evidence and other evidence in the record' without specifically citing such evidence, as well as ignoring the evidence favorable to Plaintiff." (<u>Id.</u> (quoting Tr. 16).)  Plaintiff's contentions miss the mark.

As an initial matter, the ALJ found both "headaches post herpetic neuralgia" and "left eye light sensitivity with pain" as severe impairments at step two of the SEP (Tr. 12), thus acknowledging both the headache component and the eye pain/light sensitivity components of Plaintiff's post-herpetic neuralgia.  In light of this, Plaintiff's argument that "[t]he ALJ failed to identify <u>herpes zoster</u> eye pain as a symptom and as a severe impairment" (Docket Entry 11 at 17 (emphasis added)) essentially amounts to a complaint over the ALJ's word choice rather than an assertion of error in failing to identify any severe impairments.  Moreover, the ALJ properly found Plaintiff's herpes zoster (shingles) a non-severe impairment (<u>see</u> Tr. 12-13), because her active outbreak of shingles in August 2014 cleared within a few months (<u>see</u> Tr. 476-85) and thus did not last for 12 months as required for a severe impairment under the regulations, <u>see</u> 20 C.F.R. § 404.1509.

Plaintiff additionally faults the ALJ for "fail[ing] to discuss any of the procedures [Plaintiff underwent] in an attempt to diminish or relieve her [post-herpetic neuralgia] symptoms," including "various ganglion nerve blocks, of both a chemical and an

10

operative nature," and "an ablation procedure (in effect, burning the nerve tissue to prevent it from sending pain impulses), all of which did not effectively diminish the pain." (Docket Entry 11 at 17.) The ALJ's discussion of the record evidence relating to Plaintiff's post-herpetic neuralgia included the following:

> [Plaintiff] has alleged that she is unable to work due to[, inter alia,] . . . vision problems[ and] headaches. In her Function Report, [Plaintiff] . . . reported having pain due to shingles and sensitivity to light. . . . Due to shingles, [Plaintiff] stated that she has vision problems and needs to constantly wear sunglasses because of pain and light sensitivity in her eyes. She rated the pain in her eyes an 8 out of 10 despite pain medication. . . . She testified that her pain level also affects her ability to concentrate and focus.
>
> . . .
>
> Progress notes from November 2015 show that [Plaintiff] was treated for reported head pain due to herpetic neuralgia of the right upper forehead. However, physical exam findings note that [Plaintiff] was in no acute distress with normal musculoskeletal and neurological findings. . . . Opthalmology findings indicated no diminished or blurred vision.
>
> At the internal medicine consultative examination in February 2016 with Dr. Everett Bolz, [Plaintiff] presented with sunglasses and appeared uncomfortable sitting for the examination due to the lights. Eye examination was normal and vision testing showed 20/50 in the right eye and 20/30 in the left.

(Tr. 16 (internal citations omitted).)

Although that discussion did not specifically include the ganglion blocks and ablation procedure Plaintiff underwent (see id.; see also Tr. 426-45, 464-75), "'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his

11

decision,'" <u>Reid v. Commissioner of Soc. Sec.</u>, 769 F.3d 861, 865 (4th Cir. 2014) (quoting <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005)). Moreover, the ALJ indicated that he "careful[ly] consider[ed] the entire record" (<u>see</u> Tr. 15 (bold font omitted)), and "[t]he Court is entitled to rely on th[at] representation[] absent a compelling reason to the contrary," <u>Hunter v. Colvin</u>, No. 1:10CV401, 2013 WL 2122575, at *4 (M.D.N.C. May 15, 2013) (unpublished) (Webster, M.J.) (citing <u>Grubby v. Astrue</u>, No. 1:09CV364, 2010 WL 5553677, *6 (W.D.N.C. Nov. 18, 2010) (unpublished) (in turn citing <u>Rappaport v. Sullivan</u>, 942 F.2d 1320, 1323 (8th Cir. 1991))), <u>recommendation adopted</u>, slip op. (M.D.N.C. June 18, 2013) (Eagles, J.). Plaintiff has provided no such compelling reason. (<u>See</u> Docket Entry 11 at 17.)

Furthermore, as the above-quoted discussion makes clear, the ALJ expressly acknowledged Plaintiff's complaints of eye pain, headaches, and light sensitivity, as well as her alleged need to take pain medication and wear sunglasses indoors (<u>see</u> Tr. 16), and the ALJ accommodated those complaints in the RFC by including restrictions to no tasks involving visual precision, no concentrated exposure to bright lights, flashing lights, and outdoor sunlight, and an allowance to wear sunglasses indoors (<u>see</u> Tr. 15). As such, Plaintiff has not shown how remand for an express discussion of the ganglion blocks and ablation procedure would lead to a different outcome in her case. <u>See generally</u>

12

Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect opinion [by an ALJ] unless there is reason to believe that the remand might lead to a different result").

Simply put, Plaintiff's first assignment of error fails as a matter of law.

## 2. RFC[7]

Plaintiff next asserts that "[t]he ALJ set forth an RFC finding that was vague and failed to account for Plaintiff's severe impairments" (Docket Entry 11 at 18), as well as that "[t]he ALJ failed to present a logical connection between the evidence of record and his conclusions as to Plaintiff's RFC" (id. at 20). Plaintiff's arguments fall short.

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. See Hines, 453 F.3d at 562–63; 20 C.F.R. § 404.1545(b). The ALJ then must match the claimant's exertional abilities to an appropriate

_____

[7] As Plaintiff's second and third assignments of error both challenge the ALJ's RFC (see Docket Entry 11 at 18, 20), this Recommendation will discuss them together.

13

level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. § 404.1567. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. See 20 C.F.R. § 404.1569a(c). An ALJ need not discuss every piece of evidence in making an RFC determination. See Reid, 769 F.3d at 865 (citing Dyer, 395 F.3d at 1211). However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).

a. **Vagueness/Inadequacy of RFC**

Plaintiff first attacks the ALJ's inclusion of restrictions to frequent kneeling and crouching in the RFC, arguing that such restrictions "fail[] to consider" the opinion of Plaintiff's treating orthopedic surgeon, Dr. James Melvin, that, "[d]ue to the knee replacement, [Plaintiff] will have discomfort sitting for long periods of time with the knee flexed, running, kneeling, crawling and squatting." (Docket Entry 11 at 18 (referencing Tr. 15, and quoting Tr. 907).) Plaintiff's argument glosses over the fact that Dr. Melvin offered that opinion on July 3, 2013 (see Tr. 906-07), over a year prior to Plaintiff's alleged disability onset date and prior to her left knee arthroscopy and debridement of scar tissue and adhesions in April 2014 (see Tr. 965-66). Moreover, even prior

14

to Plaintiff's 2014 arthroscopy, Dr. Melvin did not restrict Plaintiff to occasional (or less than frequent) kneeling and squatting; rather, he opined only that Plaintiff would experience "discomfort" with such activities. (Tr. 907.) Plaintiff has not shown how the ALJ's restriction to frequent (as opposed to constant) kneeling and crouching conflicts with Dr. Melvin's opinion.

Next, Plaintiff contends that, although the ALJ restricted Plaintiff from "concentrated exposure to bright lights, flashing lights, or outdoor sunlight" (Tr. 15), "[t]he ALJ made no effort to define what constitutes 'bright lights' at the hearing or in his decision." (Docket Entry 11 at 18.) According to Plaintiff, "a 'bright' light may be a 60 watt bulb, a 40 watt bulb, or even less," and "[i]t is unknown whether the past relevant jobs that the ALJ found Plaintiff could perform involved 'bright' lighting or some other level of lighting." (Id. at 19.) Those contentions falter for two reasons.

First, despite representation by counsel at the hearing, Plaintiff objected neither to the purported vagueness of the ALJ's bright lights restriction in the dispositive hypothetical question (see Tr. 54-57), nor to the VE's testimony that an individual restricted from concentrated exposure to bright lights, flashing lights, or outdoor sunlight could nonetheless perform Plaintiff's past relevant work as a Management Trainee and Health Club

15

Membership Salesperson (see Tr. 57-67). As a result, Plaintiff has waived, in this Court, any challenge to the ALJ's bright lights restriction and to the ALJ's adoption of the VE's testimony that Plaintiff's former work as a Management Trainee and a Health Club Membership Salesperson could accommodate the ALJ's bright lights restriction. See Stepinski v. Astrue, No. CA 11-183, 2012 WL 3866678, at *9-10 (D.R.I. Aug. 6, 2012) (unpublished) ("The [c]ourt views unfavorably the silence of [the p]laintiff's counsel at the hearing regarding the omission about which he now complains. Reversal and remand . . . would encourage other counsel to remain silent in similar circumstances. This [c]ourt is disinclined to provide such an incentive[ ] . . . [and] finds that [the p]laintiff waived this issue by failing to raise it before the ALJ." (internal citations omitted)), recommendation adopted, 2012 WL 3863812 (D.R.I. Sept. 5, 2012) (unpublished).

Second, even if Plaintiff had not waived this argument, consideration of the entire exchange between the ALJ and the VE at the hearing makes clear what the ALJ meant by his bright lights restriction. During the ALJ's questioning of the VE, the ALJ elaborated on his bright lights restriction by explaining that "[w]ork tasks indoors or under indoor lighting c[ould] be accommodated with sunglasses" (Tr. 55). Thus, as the Commissioner argues, "[t]he context [] made clear that ordinary 'indoor lighting' was acceptable (with sunglasses)." (Docket Entry 13 at

16

13.)  Moreover, the VE expressed no confusion over the meaning of the ALJ's bright lights restriction.  (See Tr. 54-67.)

Plaintiff also takes issue with the ALJ's preclusion in the RFC of "tasks [that] involve small objects or that require visual precision," which the ALJ further defined as "'tasks that require use of fine motor skills to finger objects that are smaller than one inch that need to be placed in exact locations, such as electronic circuit boards or other smaller electronic items that require exact placement of parts.'"  (Docket Entry 11 at 19 (quoting Tr. 15).)  According to Plaintiff, "the ALJ failed to take into account the necessity of being able to read normal print, which is considerably smaller than one inch."  (Id.)  More specifically, Plaintiff points out that the job descriptions in the Dictionary of Occupational Titles ("DOT") for Plaintiff's prior work as a Management Trainee and Health Club Membership Salesperson reflect that both jobs require reading of job-related materials. (Id. at 19-20 (referencing DOT, No. 189.167-018 (Management Trainee), 1991 WL 671497 (G.P.O. 4th ed. rev. 1991), DOT, No. 293.357-022 (Membership Solicitor), 1991 WL 672580).)  Plaintiff emphasizes that the VE defined visual precision as "something like small lines or thin lines, small wording" (Tr. 63), and that the ALJ's preclusion of tasks involving visual precision "would not allow for 'small lines or thin lines, small wording' as such things

17

are smaller than the one inch definition." (Docket Entry 11 at 20.)

Despite Plaintiff's acknowledgment that the ALJ's small objects/visual precision restriction "seem[ed] to relate more to the use of fine motor skills than [the] ability to see the objects" (id. at 19), Plaintiff nonetheless attempts to convert the ALJ's restriction into one precluding the reading of normal-sized print (id. at 19-20). That attempt fails for two reasons.

First, and most critically, the ALJ did not find that Plaintiff had a medically determinable vision impairment at step two of the SEP (see Tr. 12-13), and found at step three that Plaintiff "d[id] not meet Listing 2.02 for Impairment of Visual Acuity because her remaining vision in the better eye after best correction [wa]s not 20/200 or less" (Tr. 14). The ALJ further noted during his discussion of the RFC that, in February 2016, Plaintiff's vision had tested at 20/50 in the right eye and 20/30 in the left eye (Tr. 16; see also Tr. 407). Thus, the ALJ's decision as a whole provides no support for Plaintiff's contention that the ALJ intended the small objects/visual precision restriction to preclude Plaintiff from reading normal-sized print.

Second, the following exchange between Plaintiff's counsel, the VE, and the ALJ makes clear that the ALJ intended the small objects/visual precision restriction as a limitation on Plaintiff's ability to engage in the precise placement of small objects:

18

[Plaintiff's counsel:] Visual precision, how do you define visual precision in answering the [ALJ]'s question?

[VE:] The ability to see precise objects, such as like thin lines or <u>smaller wording</u>.

[Plaintiff's counsel:] Well, you're kind of defining the term by using its own term itself. What is precise?

[VE:] Such as something like small lines or thin lines, <u>small wording</u>.

[Plaintiff's counsel:] Wouldn't you agree that different people can have different interpretations of what constitutes visual precision?

[VE:] That's possible.

[Plaintiff's counsel:] Wouldn't you agree that different people would have different definitions of what constitutes a small object?

[VE:] Yes, that's possible as well.

[ALJ:] All right, point well taken. So let me provide a little definition then if will help then [sic]. Because I agree that my wording was probably not precise in terms of size or details and that was vague wording.

. . .

So when I say no tasks involving small objects or that require visual precision, I specifically mean <u>tasks that require fine motor skills to finger objects that are smaller than one inch, that would need to be placed onto - or into exact locations, such as electronic circuit boards or other small electronic items</u>, that require exact placement of parts. So what I envision here is – when I talk about small objects and visual precision is <u>being able to see and manipulate small things that have to be placed exactly in a particular location</u> in order for the object to work or for the task to be properly completed.

19

(Tr. 63-64 (emphasis added).)  Thus, even though the VE initially defined visual precision to mean the ability to see "precise objects, such as like thin lines or smaller wording" (Tr. 63 (emphasis added)), the ALJ then refined his definition to make clear that he intended to convey a restriction on Plaintiff's ability to engage in fine finger movements to place objects smaller than one inch in exact locations (see Tr. 63-64) and the VE indicated that Plaintiff's prior work as a Management Trainee and Health Club Membership Salesperson remained available (see Tr. 64).

b.  **Logical Bridge Between Evidence and RFC**

Plaintiff's second attack on the RFC concerns the ALJ's alleged "fail[ure] to present a logical connection between the evidence of record and his conclusions as to Plaintiff's RFC." (Docket Entry 11 at 20.)  In that regard, Plaintiff observes that "the ALJ listed a multitude of limitations in his RFC, yet he failed to identify evidence in the record supporting the small objects/visual precision requirement, the frequent balance, stoop, kneel, crouch and occasionally crawl requirements, the avoidance of concentrated exposure to bright lights requirements, the allowance for sunglasses requirements [sic] for indoor work tasks or under indoor lighting, or the off-task requirement."  (Id. at 20-21 (internal citation omitted).)  Contrary to Plaintiff's arguments, the ALJ sufficiently identified evidence in the record supporting

20

the limitations in the RFC to permit meaningful judicial review by this Court.

Regarding the small objects/visual precision restriction, the ALJ found that Plaintiff suffered from severe carpal tunnel syndrome of the right hand at step two of the SEP (see Tr. 12), and then, in support of the RFC, discussed that "Dr. Bolz noted a fracture deformity of the right wrist" and "4/5 grip strength," as well as that "an ultrasound of the bilateral hands" showed a "moderate probability of median entrapment on the right hand" (Tr. 16). Those findings also explain why the ALJ included limitations to occasional handling and fingering with the right upper extremity in the RFC. (See Tr. 15.)

Concerning the ALJ's postural limitations, the ALJ acknowledged Plaintiff's indication on a Function Report that she had "problems with [] squatting, bending, . . . [and] kneeling" (Tr. 16; see also Tr. 263), found that Plaintiff's degenerative disc disease and status post total left knee arthroplasty constituted severe impairments at step two (see Tr. 12), and pointed out in support of the RFC that "[f]indings from an examination in April 2015 show[ed] that [Plaintiff] had mild degenerative changes in the spine" (Tr. 16 (citing Tr. 391)), but that, although Plaintiff had "reduced range of motion in the spine and knee[s], [] all other findings were within normal limits" (id. (citing Tr. 406-11)). Moreover, the ALJ afforded "little probative

21

weight" to the state agency medical consultants (Tr. 18) who found Plaintiff capable of medium work without any postural limitations (see Tr. 83-84, 114-15), noting that the consultants "neither examined [Plaintiff] nor based their opinions on the most recent evidence of record, which support[ed] further limitations" (Tr. 18). In further support of the postural limitations, the ALJ accorded "only partial weight" to the opinion of Dr. Bolz that Plaintiff "[wa]s moderately severely impaired in performing certain postural activities," finding that such an opinion "d[id] not give specific functional limitations." (Tr. 17; see also Tr. 410.)

The ALJ also supplied a logical bridge between the record evidence and his preclusion of concentrated exposure to bright lights, flashing lights, and outdoor sunlight and his allowance to wear sunglasses for work under indoor lighting (see Tr. 15). The ALJ recognized Plaintiff's statements that she had "pain due to shingles and sensitivity to light," that she "needs to constantly wear sunglasses because of pain and light sensitivity in her eyes," and that "[s]he rated the pain in her eyes an 8 out of 10 despite pain medication." (Tr. 16; see also Tr. 43-44, 46, 49, 262.) However, the ALJ found Plaintiff's statements about her symptoms "not entirely consistent with the medical evidence and other evidence in the record" (Tr. 16) and further noted that "the evidence suggest[ed] that [Plaintiff]'s symptoms m[ight] not be accurately reported and m[ight] not exist at the level of severity

22

assumed by her testimony" (Tr. 17). Nevertheless, "[t]o account for [Plaintiff's] allegations of pain and other symptoms," the ALJ precluded Plaintiff from "concentrated exposure to bright lights, flashing lights, or outdoor sunlight" and "allowed [Plaintiff] to wear sunglasses for frequent exposure to work task[s] indoors or under indoor lighting." (Id.)

The ALJ also adequately explained the RFC's allowance for Plaintiff to remain off-task for up to 10 percent of the workday in addition to normal breaks (see Tr. 15). Consistent with that allowance, the ALJ found that Plaintiff's non-severe mental impairments resulted in only mild limitation of Plaintiff's ability to maintain concentration, persistence, or pace at step two of the SEP. (See Tr. 13.) Moreover, the ALJ acknowledged Plaintiff's testimony that she suffered "fatigue from her medications" and "that her pain level also affect[ed] her ability to concentrate and focus" (Tr. 16), but found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [] not entirely consistent with the medical evidence and other evidence in the record" (id.). However, the ALJ stated that he "view[ed] the evidence in the light most favorable to [Plaintiff]" (Tr. 18), and included the off-task allowance to accommodate Plaintiff's alleged "pain and side effects from medication" (Tr. 17).

23

In sum, Plaintiff's second and third issues on review do not warrant reversal or remand.

### 3. Opinion Evidence

In Plaintiff's final assignment of error, she asserts that "[t]he ALJ has failed to state the weight he has given to Plaintiff's various treating providers whose findings and opinions appear in the record." (Docket Entry 11 at 21.) In that regard, Plaintiff faults the ALJ for according great weight to consultative psychological examiner Dr. Patrick C. Quinn (id. (citing Tr. 17)), and for failing to discuss and/or weigh the opinions and findings of Dr. Melvin, Dr. Gary T. Raflo, Dr. Landirs Shaun Williams, Dr. Jason A. Ravanbahkt, Dr. Robert B. Wilson II, Dr. Joshua A. Rheinbolt, Dr. Brian K. Cain, and Dr. Bolz (id. at 21-22 (citing Tr. 410, 906-07, 1784)). Plaintiff's arguments do not establish an entitlement to relief.

The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. 20 C.F.R. § 404.1527(c)(2) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). The rule also

24

recognizes, however, that not all treating sources or treating source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion. See 20 C.F.R. § 404.1527(c)(2)(ii). Moreover, as subsections (2) through (4) of the rule detail, a treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence of record. See 20 C.F.R. § 404.1527(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590 (emphasis added). Finally, statements from medical sources (and even treating sources) that a claimant qualifies as disabled or cannot work do not constitute "medical opinions as described in [§ 404.1527(a)(1)], but are, instead, opinions on issues reserved for the Commissioner" and do not warrant controlling weight. 20 C.F.R. § 404.1527(d).[8]

Consultative examiners (such as Drs. Quinn and Bolz) do not constitute treating sources under the regulations, see 20 C.F.R.

---

[8] For claims filed on or after March 27, 2017, the Commissioner has significantly amended the regulations governing opinion evidence. The new regulations provide that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. As Plaintiff filed her claims prior to March 27, 2017 (see Tr. 10), this Recommendation has analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

§ 404.1527(c)(2), and thus their opinions, as a general proposition, do not warrant controlling weight, <u>Turberville v. Colvin</u>, No. 1:11CV262, 2014 WL 1671582, at *6 (M.D.N.C. Apr. 23, 2014) (unpublished) (Auld, M.J.), <u>recommendation adopted</u>, slip op. (M.D.N.C. May 15, 2014) (Eagles, J.). However, the ALJ must nevertheless evaluate consultative opinions using the factors outlined in the regulations, and expressly indicate and explain the weight he or she affords to such opinions. <u>See</u> 20 C.F.R. § 404.1527(c) ("Regardless of its source, [the ALJ] will evaluate every medical opinion [he or she] receive[s]" and where an opinion does not warrant controlling weight, the ALJ must "consider all of the . . . factors [in 20 C.F.R. § 404.1527(c)(1)-(6)] in deciding the weight [to] give to any medical opinion.").

**a.  Dr. Quinn**

Plaintiff takes issue with the ALJ's decision to afford "great weight" to the opinions of consultative <u>psychological</u> examiner Dr. Quinn (Tr. 17) "when so many of [Plaintiff]'s limitations are <u>physical</u> in nature." (Docket Entry 11 at 21 (emphasis added).) In that regard, Plaintiff points out that Dr. Quinn lacked the qualifications "to give an opinion as to [Plaintiff]'s exertional capacity, her postural abilities, her manipulation abilities, her visual perception, her nerve-related pain issues, her environmental issues, or her need for sunglasses in the workplace." (<u>Id.</u>) According to Plaintiff, Dr. Quinn "gave an opinion as to

26

Plaintiff's mental state (without performing any formal mental status testing), and her [sic] opinion has virtually no bearing on [] Plaintiff's overall functional abilities."  (Id.)

The ALJ did not err in his consideration of Dr. Quinn's opinions, because the ALJ did not rely upon Dr. Quinn's opinions to formulate Plaintiff's physical RFC; rather, the ALJ credited Dr. Quinn's opinion that Plaintiff's mental impairments would not "prevent her from tolerating the stress and pressure associated with day-to-day [work] or similar activity" (Tr. 17; see also Tr. 401) and accordingly found that Plaintiff's depression and anxiety constituted non-severe impairments that "d[id] not cause more than minimal limitation in [her] ability to perform basic mental work activities" (Tr. 13).  Moreover, Dr. Quinn's report directly contradicts Plaintiff's argument that Dr. Quinn "gave an opinion as to Plaintiff's mental state (without performing any formal mental status testing)" (Docket Entry 11 at 21), as the report contains both a "Narrative Mental Status" (Tr. 397) and individual findings for orientation (see Tr. 398), immediate retention and recall (see id.), recent memory (see id.), remote memory (see Tr. 399), fund of information (see id.), calculations (see id.), abstract reasoning (see Tr. 399-400), and insight (see Tr. 400).

b.  **Dr. Melvin**

With regard to Dr. Melvin, Plaintiff challenges the ALJ's failure to "discuss what weight he gave to the opinions of Dr.

27

Melvin . . . and the limitations and prognosis he set forth" in a letter to Plaintiff's counsel dated July 3, 2013. (Docket Entry 11 at 21 (citing Tr. 906-07).) In the letter, Dr. Melvin estimated that, <u>as of July 2013</u>, Plaintiff "ha[d] a 40[ percent] disability to the left lower extremity," noted that her left knee showed signs of "developing early patellar clunk syndrome," indicated that she "<u>very well m[ight] need arthroscopic debridement of scar tissue</u>," and opined that she would have "discomfort sitting for long periods of time with [her left] knee flexed, running, kneeling, crawling, and squatting." (Tr. 907 (emphasis added).) Dr. Melvin noted that Plaintiff had a "<u>slight</u> gait impairment," and that he could not predict whether her mild to moderate knee pain would improve with time. (<u>Id.</u> (emphasis added).) Dr. Melvin further recommended that Plaintiff pursue "an active, healthy lifestyle." (<u>Id.</u>)

The ALJ did not discuss Dr. Melvin's July 2013 letter in his decision. (<u>See</u> Tr. 12-18.) However, the ALJ's omission, if error at all, amounts to at most harmless error, <u>see generally</u> <u>Fisher</u>, 869 F.2d at 1057, because Dr. Melvin offered that opinion over a year prior to Plaintiff's alleged disability onset date and during a time period subsequent to Plaintiff's total knee replacement in October 2012 but prior to her left knee arthroscopy in April 2014 which, as Dr. Melvin predicted (<u>see</u> Tr. 907), involved debridement of scar tissue and adhesions from the total knee replacement (<u>see</u> Tr. 965-66). As the Commissioner points out (<u>see</u> Docket Entry

28

13 at 22), Dr. Melvin released Plaintiff to return to work without restrictions on May 19, 2014, less than one month after her debridement procedure (see Tr. 984). Under such circumstances, Plaintiff has not shown that remand for an express discussion by the ALJ of Dr. Melvin's July 2013 letter would have resulted in additional, material restrictions in the RFC or an otherwise more favorable outcome in her case. See Johnson v. Barnhart, 434 F.3d 650, 655 (4th Cir. 2005) (declining to "determine whether substantial evidence support[ed] the ALJ's rejection of the [treating physician's] assessment [issued after Plaintiff's insured status for benefits expired,] because the [] assessment [wa]s not relevant"); Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984) (requiring ALJs to "explain[] the weight . . . given to obviously probative exhibits" (emphasis added)); Rivera v. Colvin, No. 5:11CV569, 2013 WL 2433515, at *4 (E.D.N.C. June 4, 2013) (unpublished) (deeming treating physician's opinion not probative to determining whether plaintiff qualified as disabled under her current application for benefits, because opinion pre-dated the plaintiff's disability onset date and addressed injuries that had improved); Ambrose v. Astrue, 2:11CV683, 2013 WL 1308981 *12 (E.D. Va. Mar. 28, 2013) (unpublished) (holding that ALJ's failure to explain weight given to treating physician's opinion qualified as harmless error where opinion (issued two years after the

29

plaintiff's date last insured) remained "[in]consistent with the record during the relevant period").

c.  **Drs. Raflo and Rheinbolt**

Dr. Raflo, an opthalmologist, treated Plaintiff immediately after her alleged disability onset date for the approximately two-and-a-half-month-period Plaintiff had an active herpes zoster (shingles) infection in her right eye. (See Tr. 476-85.) By the end of that period, Dr. Raflo noted that Plaintiff's right eye "look[ed] good" and recommended that Plaintiff see her primary care physician for headaches and/or post-herpetic pain. (Tr. 485.) Dr. Raflo did not offer an opinion regarding the impact of Plaintiff's zoster infection on her functional abilities (see Tr. 476-85), and the record does not reflect any subsequent treatment by Dr. Raflo.

The ALJ's decision does not specifically reference Dr. Raflo's treatment (see Tr. 12-18); however, that omission constitutes, at most, harmless error, see generally Fisher, 869 F.2d at 1057. As discussed above in connection with Plaintiff's first issue on review, her active zoster infection did not meet the 12-month durational requirement for a severe impairment, see 20 C.F.R. § 404.1509, and thus the ALJ properly focused his discussion on Plaintiff's treatment for the post-herpetic neuralgia symptoms caused by the zoster infection. As with Dr. Melvin, Plaintiff has

30

thus not shown that an express discussion by the ALJ of Dr. Raflo's treatment would result in a more favorable outcome for Plaintiff.

So far as the record reflects, Dr. Rheinbolt, also an opthalmologist, treated Plaintiff two times on March 15, 2017 (see Tr. 1679-81), and September 18, 2017 (see Tr. 642-44). On March 15, 2017, Plaintiff complained of blurry vision, sticky eyes, and light sensitivity, but denied eye pain. (See Tr. 1679.) Dr. Rheinbolt tested Plaintiff's vision in the right eye at 20/80 and in the left eye at 20/100 (see Tr. 1680), and prescribed Valtrex as well as the use of artificial tears (see Tr. 1681). Approximately six months later, Dr. Rheinbolt noted Plaintiff's vision had improved to 20/30 on the right and 20/40 on the left (see Tr. 643) and continued to prescribe Valtrex (see Tr. 642). In neither record did Dr. Rheinbolt note that Plaintiff wore sunglasses or recommend that Plaintiff wear them. (See Tr. 642-44, 1679-81.)

As an initial matter, doubt exists as to whether Dr. Rheinbolt, having treated Plaintiff on only two occasions, qualifies as a treating physician. See 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated [a claimant] and the more times [a claimant] have been seen by a treating source, the more weight [the ALJ] will give to the source's medical opinion. When the treating source has seen [a claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will

31

give the source's opinion more weight than [the ALJ] would give it
if it were from a nontreating source." (emphasis added)).  Whether
properly considered as a treating physician nor not, Dr. Rheinbolt
did not offer any opinions as to the effect of Plaintiff's eye
impairments on her physical functioning and thus Plaintiff merely
challenges the ALJ's failure to discuss Dr. Rheinbolt's two
treatment records.  Given the ALJ's finding that Plaintiff's
"headaches post herpetic neuralgia" and "left eye light sensitivity
with pain" qualified as severe impairments (Tr. 12), and his
preclusion of concentrated exposure to bright lights, flashing
lights, or outdoor sunlight, as well as an allowance to wear
sunglasses indoors on the job in the RFC (see Tr. 15), Plaintiff
has not established that remand to require the ALJ to discuss Dr.
Rheinbolt's treatment records would have a material impact on
Plaintiff's case.

d.  **Drs. Williams, Ravanbahkt, and Wilson**

Plaintiff objects to the ALJ's failure to "reference any of
the pain management doctors . . . who saw Plaintiff" and the
omission of any "discussion in the record as to any of the
findings, treatment, procedures performed, or course of care of any
of these physicians."  (Docket Entry 11 at 21.)  According to
Plaintiff, "[i]n a case where the primary medical impairment taking
Plaintiff out of, and keeping Plaintiff from performing, her last

32

job, is post-herpetic neuralgia and trigeminal neuralgia caused by the zoster virus, with resulting photosensitivity, severe eye pain, nausea, vomiting, and headaches, it is difficult to understand why no reference is made to these physicians or any of their findings and opinions." (Id. at 21-22.)

As discussed in connection with Plaintiff's first assignment of error, "'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision,'" Reid, 769 F.3d at 865 (quoting Dyer, 395 F.3d at 1211), and, as the ALJ indicated that he "careful[ly] consider[ed ] the entire record" (see Tr. 15 (bold font omitted)), "[t]he Court is entitled to rely on th[at] representation[] absent a compelling reason to the contrary," Hunter, 2013 WL 2122575, at *4. Again, Plaintiff has not presented any such compelling reason. (See Docket Entry 11 at 21-22.) Furthermore, the ALJ expressly acknowledged Plaintiff's complaints of eye pain, headaches, and light sensitivity, as well as her alleged need to take pain medication and wear sunglasses indoors (see Tr. 16), and accommodated those complaints in the RFC (see Tr. 15). Plaintiff has simply not shown that remanding this matter for an express discussion by the ALJ of Plaintiff's pain management procedures would lead to a different result in her DIB claim. See generally Fisher, 869 F.2d at 1057.

33

e.  **Dr. Cain**

Plaintiff additionally challenges the ALJ's "fail[ure] to signify what weight, if any, he gave to the opinion of [Plaintiff's primary care physician,] Dr. [] Cain, who, after filling out [Plaintiff]'s disability paperwork, gave an assessment; 'Currently she is severely limited in her ability to do much of anything beyond her [activities of daily living] as exertion does exacerbate her post-herpetic neuralgia.'" (Docket Entry 11 at 22 (quoting Tr. 1784).) The ALJ's failure to mention or weigh Dr. Cain's above-quoted statement (see Tr. 12-18) does not constitute reversible error. As the Commissioner argues:

> If one looks more closely at Dr. Cain's statements, [] he is simply reporting what Plaintiff subjectively stated to him. Dr. Cain explains that Plaintiff "*states*" she cannot perform activities: Plaintiff "*states* that she has very limited ability to do much throughout the day. She *states* that even attempting light housework results in severe headaches" (Tr. 1785, emphasis supplied). Otherwise, Dr. Cain largely notes Plaintiff's diagnoses, and then concludes by again noting that Plaintiff "*states*" she is "limited in her ability to do day-to-day activities," which has resulted in significant sadness [(*Id.*)]. These notations from Dr. Cain, therefore, are not true medical opinions; rather, they are a recitation of what Dr. Cain has been told by Plaintiff. As the United States Court of Appeals for the Fourth Circuit has aptly explained, the mere memorialization of a patient's subjective complaints by a physician does not "transform[] his observations into 'clinical evidence.' If this were true, it would completely vitiate any notion of objective clinical medical evidence." *Craig*, 76 F.3d

at 590 n.2. "There is nothing objective" about a doctor saying, without more, "I observed my patient telling me she was in pain." *Id.*

(Docket Entry 13 at 24 (underscoring added).)

### f. **Dr. Bolz**

Lastly, Plaintiff criticizes the ALJ for "fail[ing] to state what weight he gives to Dr. Bolz'[s] opinion that '[Plaintiff]'s ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying, traveling, and pushing and pulling heavy objects appears to be at least moderately severely impaired due to the sum of [Dr. Bolz's] findings described [in his report].'" (Docket Entry 11 at 22 (quoting Tr. 410).) Plaintiff's argument inexplicably overlooks the fact that the ALJ expressly accorded "partial weight" to Dr. Bolz's opinion in question, finding the opinion "vague[]" and noting that the opinion lacked "specific functional limitations." (Tr. 17.)

In short, as Plaintiff has not shown reversible error in the ALJ's consideration of the opinion evidence of record, Plaintiff's fourth and final assignment of error misses the mark.

### III. CONCLUSION

Plaintiff has not established grounds for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for

Summary Judgment (Docket Entry 9; Docket Entry 11 at 2-3) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 12) be granted, and that judgment be entered dismissing this action.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

August 26, 2020